## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EDWARD BETTENCOURT,<br>　　　　　　　　**Plaintiff,**<br><br>　　　　v.<br><br><br>TOWN OF MENDON,<br>MENDON POLICE DEPARTMENT,<br>CHIEF ERNEST HORN, and<br>LIEUTENANT DONALD BLANCHETTE,<br>　　　Defendants. | **CIVIL ACTION<br>NO. 16-40065-TSH** |

### ORDER AND MEMORANDUM OF DECISION
**September 26, 2018**

**HILLMAN, D.J.**

### Background

Edward Bettencourt ("Plaintiff" or "Bettencourt") has filed suit against the Town of Mendon ("Town"), Mendon Police Department[1], Chief Ernest Horn ("Chief Horn")[2] and Lieutenant Donald Blanchette ("Blanchette", and together with the Town and Horn "Defendants") asserting claims for violation of the Massachusetts Whistleblower Act, Mass.Gen.L. ch.149, § 185 (Count One—Town of Mendon); violation of the Massachusetts Civil Rights Act, Mass.Gen.L. ch. 12, §§ 11H, I ("MCRA") (Count Two— Horn and

---

[1] The Mendon Police Department is not an entity separate from the Town and therefore, is not treated as an independent party. For that reason, the Mendon Police Department is dismissed from the case.

[2] Ernest Horn is no longer the chief of police for the Town. Because he was the chief of police during the period relevant to Bettencourt's claims, I will refer to him as "Chief Horn" throughout this opinion.

Blanchette); Conspiracy (Count Three— Horn and Blanchette); Intentional Infliction of Emotional Distress (Count Four— Horn and Blanchette); violation of his federal civil rights under 42 U.S.C. §1983 (Count Five— Horn and Blanchette); sex and gender discrimination in violation of Mass.Gen.L. ch. 151B ("Chapter 151B")(Counts Six and Seven— Horn and Blanchette), Retaliation in violation of Chapter 151B (Count Eight—all Defendants); assault and battery (Count Nine— Blanchette); and False Imprisonment (Count Ten— Blanchette). Chief Horn and Blanchette are being sued in their individual and official capacities.

This Order addresses the following motions: Defendant, Lieutenant Blanchette's Partial Motion For Summary Judgment (Docket No. 30) and Defendant Town of Mendon, Mendon Police Department and Chief Ernest Horn's Motion For Summary Judgment (Docket No. 34). For the following reasons, the Defendants' motions for summary judgment are granted, in part, and denied, in part.

### Facts

Bettencourt became employed by the Town as a police officer in November of 1997. While working, Bettencourt would socialize with Blanchette and frequently had coffee in Blanchette's office and they would joke around. Bettencourt, Officer Bruce Poirier ("Poirier") and Blanchette would often buy each other coffee. There were several times that Blanchette would request that Bettencourt have lunch with him. Bettencourt did not enjoy these interactions, but tried to get along with Blanchette to "minimize abuse and to get along in the department." In 2012, Bettencourt was choking on some Chinese food and Blanchette saved Bettencourt from choking.

In 2008, Chief Horn began attending law school with permission from Mendon's Board of Selectmen who also helped pay some of his tuition. Chief Horn was routinely absent from the

Mendon Police Department ("MPD") until he graduated from law school in 2011/2012.  While Chief Horn was in law school, Blanchette was the de facto Chief. Blanchette felt overworked as the result of having to cover for Chief Horn because he was doing payrolls, billing, running the shift, and attending meetings. He was handling such duties both for the fire department and the MPD. Basically, Chief Horn had handed the day to day operation do of the MPD over to Blanchette. In 2008, Blanchette told Bettencourt that "while Chief Horn was attending law school, the Chief was not to be bothered and if you (Bettencourt) ever go over my head there will be severe repercussions." While supervising, Blanchette yelled or spoke loudly to everyone and yelled at Bettencourt on an almost daily basis.        .

On June 16, 2013, two Mendon Police officers, Poirier and James Walckner ("Walckner"), made allegations of misconduct to the Massachusetts State Police ("MSP") regarding Blanchette. The MSP investigated the allegations and conducted interviews of several MPD personnel.  On September 18, 2013, Bettencourt was interviewed by the MSP and he told the MSP that on September 8, 2013, Blanchette took a knife from Poirier, started approaching Bettencourt and backed him into a filing cabinet while holding the knife away from his throat. Bettencourt asked Blanchette to stop threatening him and told him that he was "afraid of knives." Blanchette continued to approach him (Bettencourt) while saying "slash, slash, slice, slash, slash" and making threating motions with the knife towards Bettencourt's throat and groin area. Blanchette was talking about how he learned to kill a man with a knife in the Marines. Bettencourt told the MSP that Blanchette once pulled his Taser on Poirier, Chief Horn, and himself.  Blanchette also pulled the Taser on Bettencourt between 2009 and 2012.

Bettencourt also reported that Blanchette would jam his fingers into his rib cage and that it would cause him pain. Bettencourt reported that Blanchette punched him in the bicep during

the previous winter (2012) for leaving his police car running in the parking lot. Bettencourt also reported that Blanchette would "tit flip" him, *i.e.* walk up to him and put his hand under his pectoral muscle and push up.  The "tit flipping" occurred from 2008-2011.  Blanchette never "tit flipped" anyone else.  Bettencourt repeatedly told Blanchette to stop, but he refused to do so. Bettenccourt and several other MPD employees have described Blanchette's actions as demeaning and degrading. Bettencourt felt that the "tit flipping" was being done because he was gay.  Bettencourt ended up having gynecomastia surgery to reduce the size of his breasts.  He then started wearing his vest every day.

Bettencourt also reported being struck with a riding crop in the back of the legs. The alleged incident with the riding crop took place in 2008/2009.[3] Bettencourt also reported being ordered into in a cell along with Poirier. Blanchette was upset with Bettencourt and Poirier (apparently for eating lunch together) and the dispatcher jokingly suggested that Blanchette put them in a cell. Blanchette then took Bettencourt and Poirier to the cell block where prisoners are kept and ordered them into separate cells. Blanchette bolted the door on Poirier's cell. As Blanchette started to shut Bettencourt's cell door, he saw a look in Bettencourt's eyes and said he was joking and let Bettencourt out.  At no time was Bettencourt locked in the cell. The incident with the cell occurred in 2011 or 2012. Bettencourt also reported to the MSP that he witnessed Blanchette punch Poirier in the bicep.  Bettencourt also reported that Blanchette would poke one of their dispatchers, Robin Remillard. Bettencourt also reported that Blanchette threatened, verbally abused, and belittled everyone at the MPD.  However, he verbally and physically abused Bettencourt and Poirier more than other MPD employees.  During Bettencourt's

---

[3] Blanchette disputes this asserted fact stating that he and Bettencourt hit each other with a riding crop and that the alleged incident did not take place in this time period. Nonetheless, this is what Bettencourt *reported* to the MSP, which is the undisputed fact.

interview with the MSP he was ordered not to speak to anyone about the investigation. Bettencourt complied with this order and only told his roommate that he was meeting with the MSP, but he did not provide any explanation.

Poirier was also interviewed and he told the MSP that he, Bettencourt, and Dave Kurczy ("Kurczy" or "Sergeant Kurczy") were struck with a fiberglass bike pole. Poirier told the MSP that the officers were hit for about 6-8 months in 2008. Poirier told the MSP that Blanchette once tried to staple his leg, and that he had been verbally/physically abused and bullied since 2008. Poirier reported to the MSP that Blanchette punched him in the chest and tried to "drive stun him" in the groin. Poirier also reported that Blanchette pointed a Taser at approximately five other MPD employees.

Patricia Benoit-Rudden ("Benoit-Rudden") was also interviewed by the MSP and she reported that Blanchette was not nice to basically the entire day shift including, Bettencourt, Walckner, Poirier, Robin Remillard, Jessica LeBlanc, Steve Laporta, Kurczy and sometimes herself. Benoit-Rudden also reported instances where she has seen Kurczy upset because Blanchette had yelled at him. She also reported that Blanchette was a yeller and that it would be nothing to hear him yelling at "Pam or Dave" and tell them that they "suck as detectives." She further stated that Bettencourt and Poirier made clear to Blanchette that they didn't like the physical abuse and he should "knock it off," but Blanchette would still do it.

Robin Remillard was also interviewed by the MSP and she described Blanchette as downright mean, verbally abusive, emotionally abusive, and controlling. She also reported to the MSP that she began to look for a new job because Blanchette's supervisory style was emotionally abrasive and it caused her chest pains, heart burn, and migraines. She also reported that she changed shifts to get away from Blanchette, and that he harassed everyone. Jessica

LeBlanc was also interviewed by the MSP and she reported "jokingly" being hit by Blanchette with a closed fist.

Although it was not reciprocated, Blanchette considered his interactions with Bettencourt to be horseplay. Blanchette, in his mind, treated Bettencourt as if he was a brother. Blanchette had the most physical contact with Bettencourt and Bruce Poirier at the MPD. Bruce Poirier is a straight male.

On September 28, 2013, Blanchette called Bettencourt looking for the key to the MPD motorcycle. Blanchette forced his way into Bettencourt's office in order to get the motorcycle key because the key was not in its proper place and Blanchette could not find the key to Bettencourt's office. As a result, the door frame to Bettencourt's office was broken and the MPD fixed it. Bettencourt was not working when Blanchette was looking for the key.

On September 30, 2013, the MSP interviewed Blanchette regarding the allegations made against him. Blanchette contends that prior to his interview with the MSP, he had no knowledge of the investigation or anyone going to speak with the MSP. However, Chief Horn recalls telling him that officers had made complaints that they were being abused by him and that he told Blanchette "what [he] knew." He also told Blanchette that the MSP wanted to interview him. During his interview, Blanchette acknowledged that most of the allegations were true, including the knife incident. Shortly after Blanchette's interview with the MSP, he was placed on administrative leave, but Chief Horn changed his status to sick leave so that he continued to get paid. On October 21, 2013, Blanchette was arrested as the result of the MSP investigation. Blanchette was charged in connection with the incident where he held a knife to Bettencourt's throat. After he was charged, Blanchette and Chief Horn had very little contact.

Soon after learning about the allegations brought forward to the MSP, Chief Horn appointed special officer Thomas Green ("Green") to investigate how the MPD was being run, including allegations of abuse by Blanchette. Chief Horn told Green to report his findings to Town counsel. Green worked, or has worked, for a private consulting firm run by Chief Horn. Moreover, while the investigation purported to be independent, Chief Horn was in contact with Green during the course of the investigation.[4] After receiving and reading Green's completed report, which recommended discipline against Blanchette, Chief Horn recommended to the Board that Blanchette be demoted to patrolman. Although Green was tasked with investigating how the MPD was run and was to primarily address the allege abuse by Blanchette, his report included a substantial amount of information about Bettencourt.

On August 5, 2014, Bettencourt met with Chief Horn to discuss his (Bettencourt's) belief that Blanchette was returning and the severe anxiety and stress that he was feeling as a result. Chief Horn told Bettencourt that the process by which Blanchette would be allowed to return to work would take about a year. On the morning of August 26, 2014, Blanchette admitted in court to sufficient facts to four felonies and three misdemeanors in which the Plaintiff and Officer Bettencourt were the victims. His case was Continued Without a Finding for 18 months. That same day, Blanchette was allowed to return to full duty status at the MPD.

The day prior to Blanchette returning to work, Blanchette drove into the police station and stared at Bettencourt in an intimidating manner. On Blanchette's first day back to work, Blanchette stood in the parking lot with his arms crossed staring at Bettencourt while he unloaded his cruiser. Bettencourt called Chief Horn and told him he was uncomfortable working

---

[4] Chief Horn disputes the extent to which he had contact with Green during the investigation stating that he did not communicate with him in depth *until* Walckner started making accusations against him (Chief Horn) to Green.

with Blanchette. Chief Horn told Bettencourt he should take off work until September 1, 2014, as "sick time." On or about August 29, 2014, Sergeant Kurczy went to Bettencourt's home and informed him that Chief Horn had ordered him to take possession of his License to Carry a Firearm as well as his off duty firearm. Chief Horn acknowledges that he was not "required" to take away Bettencourt's License to Carry or his firearm.

On or about September 8, 2014, Bettencourt delivered a letter to the Mendon Board of Selectmen ("Board") along with a copy of the MSP report, asking them to terminate Blanchette's employment. That same date, Blanchette and the Town agreed to a "Last Chance Agreement," pursuant to which Blanchette agreed not to challenge his demotion and to thereafter comply with rules, regulation and policies of the MPD and refrain from engaging in abusive behavior toward other members of the MPD.

On November 24, 2014, Senior First District Attorney Daniel Bennett wrote Chief Horn a letter confirming their agreement that Blanchette would no longer be Court liaison with the Worcester County District Attorney's Office and that he would no longer be the primary arresting officer in any case. Chief Horn did not comply with the agreement that Blanchette would no longer be the primary arresting officer on any case. On December 23, 2015, while Blanchette was still on probation, Chief Horn assigned him to the Detective Division which came with an increase in pay and increased overtime opportunities.

One day, in the dispatch office, while staring at Bettencourt, Blanchette made comments about how he still runs the department and then he walked off. Specifically, Blanchette stated "[w]e still know who runs this f'ing department." The next day, Blanchette looked right at Bettencourt and made a comment about how he was a patrolman and he could say whatever he wanted in the department. As Blanchette was making this comment he took two or three steps

towards Bettencourt before veering off towards the door. Bettencourt never worked the same shift with Blanchette after he returned to the MPD on August 26, 2014.

Bettencourt filed a charge of discrimination with the Massachusetts Commission Against Discrimination ("MCAD") on November 3, 2014, alleging that Blanchette discriminated against him. Shortly after Bettencourt filed his MCAD charge of discrimination he applied for an open sergeant's position and was denied the promotion. Bettencourt was interviewed by Sergeant Kurczy, and Assistant Fire Chief Mark Bucchino, who had allegiances to Chief Horn. He was also interviewed by Town Administrator Kimberly Newman. Bettencourt does not believe that any of these individuals had any animus towards him because he was gay. Bettencourt believes that he was more experienced and had more training than the officer who was selected. Blanchette had no knowledge that Bettencourt was seeking a promotion, and Bettencourt has no knowledge of Blanchette playing a role in the denial of his promotion.

Blanchette claims that he learned that Bettencourt was gay in April of 2013, however, there is evidence in the record which suggests that he knew before that date. Blanchette was sad that Bettencourt did not tell him that he was gay because he thought they were friendly enough that Bettencourt could tell him. Prior to April 2013, officers at the MPD made accusations that Bettencourt was gay. Blanchette was aware of these accusations, but knew at this time that Bettencourt dated women. In 2008, Bettencourt told Blanchette's girlfriend that he was gay. Bettencourt has no knowledge that Blanchette's girlfriend repeated this information to Blanchette. Bettencourt never told Blanchette that he was gay. Bettencourt has never been in a relationship with a male that he made known to any personnel at the MPD and Blanchette has never made an anti-gay remark or used a gay slur at Bettencourt.

Chief Horn claims that prior to the commencement of this lawsuit, he did not know that Bettencourt was gay. However, there is evidence in the record that suggests that Chief Horn was aware that Bettencourt was gay well before suit was filed. Chief Horn claims that the first time Horn was made aware of Blanchette's objectionable conduct was around September 30, 2013, after Walckner and Poirier had gone to the MSP in June 2013. However, Chief Horn acknowledges receiving a copy of anonymous letter outlining Blanchette's objectionable conduct on March 17, 2013. The letter was first sent to radio station WMRC in Milford. Chief Horn called Blanchette into his office and asked him about the allegations. Chief Horn claims that Blanchette denied it. However, Blanchette states that he probably said that he did it. Whether Chief Horn conducted any investigation within the MPD as a result of the letter is a disputed fact, The Board, did not conduct any investigation into the allegations and neither the Board nor Chief Horn took any corrective action as the result of the letter.

Bettencourt never made a complaint about Blanchette to Chief Horn. Bettencourt also never made a complaint about Blanchette to the Board. Bettencourt did not do so because he feared professional and physical retaliation from Blanchette. Given the inferences of conflict and bias throughout this case, it is appropriate to note that Blanchette was the best man at Chief Horn's wedding. In January 2014, Sergeant Kurczy questioned Bettencourt about his discovery that he (Bettencourt) had indicated on a 2012 department form that he had been the victim of harassment. Bettencourt denied that he was the victim of harassment.

In December 2015, after Blanchette had returned to the MPD for approximately 14 months, Bettencourt reported feeling ill to Chief Horn who believed he was experiencing mental stress and told him to take some time off to feel better. Based on his observations of how distraught Bettencourt was at the time and fearing that he might hurt himself, Chief Horn took

his firearm, although he was not required to do so. Moreover, despite his contention that he took away the firearm because he felt Bettencourt was under mental stress, he would not place him on injured on duty status pursuant to Mass.Gen.L. ch. 41, §111F ("IOD"), although he had the authority to do so. Through counsel and while remaining on leave, Plaintiff subsequently requested that he be placed on IOD status. Chief Horn ultimately forwarded the request to the Board, who pursuant to Bettencourt's request, placed him on IOD status.

After Bettencourt reported Blanchette's conduct to the MSP, his take home motorcycle, which he had used for five years, was taken away and his office was moved to a trailer. Chief Horn did not renew the lease on two motorcycles, one which was used by Bettencourt and another used by Sergeant Hoar, who had been promoted and would no longer be using the motorcycle. Additionally, Bettencourt was not the only officer to be moved to the trailer, nor was he the first to be moved. However, Chief Horn gave Bettencourt's office to his personal secretary.

## Discussion

## Standard of Review

Federal Rule of Civil Procedure 56 provides that the court shall grant summary judgment if the moving party shows, based on the materials in the record, "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A factual dispute precludes summary judgment if it is both "genuine" and "material." *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48, 106 S.Ct. 2505 (1986). An issue is "genuine" when the evidence is such that a reasonable factfinder could resolve the point in favor of the non-moving party. *Morris v. Gov't Dev. Bank*, 27 F.3d 746, 748 (1st Cir. 1994). A fact is "material" when it might affect the outcome of the suit under the applicable law. *Id.*

The moving party is responsible for "identifying those portions [of the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1968). It can meet this burden either by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'" *Rakes v. U.S.*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005) (quoting *Celotex,* 477 U.S. at 4). Once the moving party shows the absence of any disputed material fact, the burden shifts to the non-moving party to place at least one material fact into dispute. *See Mendes v. Medtronic, Inc.,* 18 F.3d 13, 15 (1st Cir.1994) (discussing *Celotex,* 477 U.S. at 325). When ruling on a motion for summary judgment, "the court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Scanlon v. Dep't of Army,* 277 F.3d 598, 600 (1st Cir. 2002). However, the court should not "credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective." *Caban Hernandez v. Philip Morris USA, Inc.*, 486 F.3d 1, 8 (1st Cir. 2007).

## The Motions for Summary Judgment

Blanchette seeks summary judgment on Bettencourt's claims for violation of the MCRA, conspiracy, violation of his right to free speech and equal protection under 42 U.S.C. § 1983, Sex and Gender Discrimination under Chapter 151B, and retaliation under Chapter 151B. The Town and Chief Horn seek summary judgment on all claims against them. Where the Defendants seek summary judgment against common claims, I will address their arguments simultaneously.

### *Plaintiff's Whistleblower Claim*

Bettencourt asserts that he acted as a whistleblower when he reported Blanchette's abusive conduct to the MSP. He asserts that the Town violated his rights under the whistleblower statute, Mass. Gen. L. ch. 149, §185, when Chief Horn and Blanchette took

adverse actions against him after he made the report. The Town asserts that Bettencourt's claim is barred under the two year statute of limitations applicable to such claims.

The Massachusetts whistleblower statute "forbids Massachusetts agencies and instrumentalities from retaliating against employees who disclose to a public body any activity or practices in violation of law that the employee reasonably believes poses a risk to public health or safety. The limitations period for a claim of retaliation under the whistleblower statute is two years. 'The statutory period for complaining of a discriminatory termination does not begin to run until the employee has sufficient notice of that specific act.' " *Perez v. Greater New Bedford Vocational Tech. Sch. Dist.*, 988 F. Supp. 2d 105, 112 (D.Mass. 2013)(internal citation omitted). The Town asserts that Bettencourt's whistleblower claim accrued in 2013 when he made his report to the MSP and therefore, his claim is barred. Plaintiff makes a somewhat specious argument that he his reporting of Blanchette's abuse "continued" when he repeated his allegations to the Board in September 2014 and when he filed his complaint with the MCAD in November 2014. His argument that Chief Horn and the Town took retaliatory action against him within the two year statute of limitations has greater merit. More specifically, Chief Horn placed him on leave in December 2015, suspended his license to carry, and denied him IOD status. However, these actions are too far removed from Bettencourt's alleged whistleblowing activities for the Court to find they are causally related to save his otherwise untimely claim. Bettencourt also refers to unspecified "significant changes in working conditions." First, without a more detailed description it is impossible to determine if changes in working condition were significant enough to be considered retaliatory. Additionally, since Bettencourt does not specify when the alleged unspecified changes occurred, the Court cannot determine that they happened

within the statute of limitations period. Accordingly, I find that Plaintiff's whistleblower claim is barred by the statute of limitations.

<u>*Violation of the MCRA and Section 1983*</u>[5]

Bettencourt alleges that Blanchette and Chief Horn violated his right to freedom of speech and equal protection under section 1983 and the MCRA by punishing him for speaking up about the they physical and verbal abuse which occurred at the MPD[6]. First, these Defendants assert that Bettencourt's federal and state civil rights claims are subject to a three (3) year statute of limitations and therefore, any conduct or incidents that occurred before June 3, 2013, which Bettencourt alleges violated his rights, are time barred. Additionally, they argue that Bettencourt has failed to state a free speech claim because he was not speaking as a citizen on a matter of public concern, and his equal protection claim against Blanchette fails, as a matter of law, because he cannot show that Blanchette singled him out for unlawful oppression (because Blanchette treated everyone equally poorly).

*Whether Bettencourt's Civil Right's Claims Are Barred By the Statute of Limitations*

Defendants assert that Bettencourt's federal and state civil rights claims for violation of his First Amendment right to free speech are barred by the statute of limitations because the incidents and conduct underlying such claims occurred prior to June 3, 2013. "Section 1983 does not contain a built-in statute of limitations. For section 1983 claims, a federal court applies the

---

[5] The Massachusetts Supreme Judicial Court has indicated that claims under the MCRA are, for the most part, analyzed co-extensively with claims brought under section 1983, except that "[t]o state a claim under the MCRA, a plaintiff must show that (1) his exercise or enjoyment of rights secured by the constitution or laws of either the United States or the Commonwealth of Massachusetts (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by threats, intimidation or coercion." *Ciolino v. Eastman,* 128 F. Supp. 3d 366, 380 (D. Mass. 2015)(internal citations and citation to quoted case omitted).

[6] Bettencourt has also asserted civil rights claims against Blanchette for violation of his right to bodily integrity. Blanchette has not moved for summary judgment on that claim.

forum state's limitation period governing personal injury actions. Massachusetts has a three-year statute of limitations for personal injury actions," pursuant to Mass.Gen.L. ch. 260, §2A. *Coll. Hill Properties, LLC v. City of Worcester*, 135 F. Supp. 3d 10, 14 (D. Mass. 2015), *aff'd*, 821 F.3d 193 (1st Cir. 2016).  The statute of limitation for actions asserting violation of the MCRA is also three years. *See* Mass.Gen. L. ch. 260, §5B.

"Although section 1983 borrows its limitations period from state law, the accrual date for a section 1983 claim is measured by federal law.  Under federal law, such a cause of action accrues 'when the plaintiff knows, or has reason to know of the injury on which the action is based.'" *Alamo-Hornedo v. Puig*, 745 F.3d 578, 581 (1st Cir. 2014)(internal citations and citation to quoted case omitted).  "[A] plaintiff is deemed to know or have reason to know at the time of the act itself and not at the point that the harmful consequences are felt." *Morán Vega v. Cruz Burgos*, 537 F.3d 14, 20 (1st Cir. 2008).  Furthermore, for statute of limitation purposes, each section 1983 claim is analyzed independently. *See Nieves*, 241 F.3d at 52-53; *See also Salcedo v. Town of Dudley*, 629 F.Supp.2d 86, 98 (D. Mass. 2009).  Bettencourt asserts that numerous incidents which occurred prior to June 3, 2013 are within the statute of limitations because they were part of ongoing conduct on the part of Blanchette, that is, they were part of a continuing pattern of abuse.[7]  More specifically, Bettencourt asserts that while much of the abuse by Blanchette occurred prior to June 3, 2013, the same or similar type of abuse continued after Blanchette returned from administrative leave in August 2014. He also asserts that after June 3,

---

[7]  "The `continuing violation' doctrine is an equitable exception that saves otherwise time-barred claims if they are based on an ongoing series of acts anchored by similarity to some violation that is not time-barred. The purpose of the doctrine is to ensure that a plaintiff's claims are not foreclosed in circumstances where a plaintiff needed to see a pattern of mistreatment before becoming aware that earlier individual acts were, indeed, discriminatory." *Salcedo v. Town of Dudley*, 629 F. Supp. 2d 86, 98 (D. Mass. 2009)(internal citation and citation to quoted case omitted). The continuing violation doctrine will be discussed in more detail later in this opinion.

2013, he complained about the ongoing abuse by Blanchette-- both that which occurred prior to June 3, 2013 and that which occurred after.

First, it is not evident from the complaint, or Plaintiff's arguments made in his memoranda in opposition how the individual incidents of abuse relate to his civil rights claims for violation of his free speech and equal protection rights-- although the Court can surmise how the incidents would be relevant to his equal protection claim.[8] To the extent that Bettencourt is alleging that his first amendment rights were violated because he was punished for *speaking out* after June 3, 2013, to the MSP or otherwise about alleged abuse by Blanchette, such claims are obviously not barred by the statute of limitations. This is true even he was speaking out abuse which occurred prior to June 3, 2013. Because it is unclear to the Court how the pre-June 3, 2013 incidents relate to his claims, to the extent that Plaintiff's civil rights claims survive, I am at this time reserving ruling on the extent to which such incidents can serve as the basis of such claims.

*Whether Plaintiff has stated a claim for violation of his First Amendment Rights*

Defendant assert that Bettencourt has failed to state a claim for violation of his first amendment free speech rights because he was not speaking as a citizen on a matter of public concern. "[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick v. Myers*, 461 U.S. 138, 147, 103 S. Ct. 1684 (1983). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a

---

[8] The alleged physical abuse by Blanchette would be relevant to his free speech claim if, for instance, he alleged that Blanchette hit him with a riding crop, or "tit flipped" him because he was speaking out, but I do not read his submissions as making such allegations.

given statement, as revealed by the whole record." *Id.* To determine whether the employee's speech is protected, the court follows:

> a two-step initial inquiry. The first step requires a determination of: whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech … [T]his first step itself has two subparts: (a) that the employee spoke as a citizen and (b) that the speech was on a matter of public concern. If the answer to [this] first (two subpart) step is yes, then the possibility of a First Amendment claim arises, and the second step of the inquiry is made:
>
> > The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. This consideration reflects the importance of the relationship between the speaker's expressions and employment. A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations.

*Curran v. Cousins*, 509 F.3d 36, 44–45 (1st Cir. 2007)(internal citations omitted).  It is the court "who decides as a matter of law the issues in the two steps." *Id.*, at 45. [9]

Defendants argue that Plaintiff's speech concerns alleged verbal and physical harassment in the workplace, which are not matters of public concern, but are instead complaints about working conditions. I disagree with the Defendants. On the record before me, Bettencourt was not reporting on a few minor instances of "horseplay" which may occur in the workplace.  On the contrary, this was a person in a supervisory position, for all intents and purposes, the acting chief of police, who was allowed to physically and verbally abuse his subordinates, including *but not limited* to Bettencourt, *for years.*  Given the nature and extent of Blanchette's abusive, unprofessional conduct, Bettencourt's report to the MSP and his complaints to the Board and

---

[9] If I find that Bettencourt has satisfied the first two steps, then the jury determines whether protected speech was "a substantial or motivating factor in triggering" any adverse employment action against him, and "whether, even if the [speech] was a triggering factor[], the [D]efendant[s] would have taken the same action even if [he] had never made the statement" are questions for the jury. *Bennet v. City of Holyoke,* 230 F.Supp.2d. 207, 224 (D.Mass. 2002); *see also Lewis v. City of Boston,* 321 F.3d 207,218 (1st Cir. 2003).

Chief Horn are akin to a public employee disclosing corruption within a government agency, which are the types of communications which are protected by the First Amendment. *Cf. Bennet,* 230 F.Supp.2d. at 224 (police officers report of racism and corruption involved matters of public concern); *see also Taylor v. Town of Freetown*, 479 F.Supp.2d 227, 237 (D.Mass. 2007)(reports of matters primarily directed to personal situation are not matters of public concern, but reporting on police corruption is matter of public concern); *Thomas v. Town of Salisbury*, 277 F.Supp.3d 161 (D.Mass. 2017)(reporting on sexual harassment in department was matter of public concern). However, it is not enough that Bettencourt spoke on matters of public concern, he must have been acting as a citizen, and not in the ordinary scope of his duties as a police officer.

"A public employee who is speaking as an employee, rather than as a citizen, has no First Amendment cause of action based on his 'employer's reaction to the speech.' In other words, the focus in this context is not on the content of the speech, but 'the role the speaker occupied when he said it.'" *Bolduc v. Town of Webster*, 629 F. Supp. 2d 132, 146 (D. Mass. 2009)(internal citations and citations to quoted cases omitted). "To determine whether a public employee made speech as an employee or a citizen, the court must first identify plaintiff's official responsibilities. In identifying his official responsibilities, the proper inquiry is practical rather than formal, focusing on the duties an employee actually is expected to perform, and not merely those formally listed in the employee's job description." *McGunigle v. City of Quincy*, 132 F. Supp. 3d 155, 170–71 (D. Mass. 2015), *aff'd,* 835 F.3d 192 (1st Cir. 2016)(internal quotation marks, internal citations and citation to quoted case omitted). From the record, I can assume that like the plaintiff in *McGunigle,* Bettencourt was a non-supervisory police officer, and therefore, would not have had the authority to set MPD priorities or department policies. Whether he spoke

pursuant to his employee responsibilities is determined based on the context of the speech applying the following non-exclusive factors: (1) whether the employee was commissioned or paid to make the speech in question; (2) the subject matter of the speech; (3) whether the speech was made up the chain of command; (4) whether the employee spoke at [his] place of employment; (5) whether the speech gave objective observers the impression that the employee represented the employer when [he] spoke (lending it 'official significance'); (6) whether the employee's speech derived from special knowledge obtained during the course of [his] employment; and (7) whether there is a so-called citizen analogue to the speech. *Id* (internal quotation marks and citation to quoted case omitted).

In this case, application of the factors favor a finding that Bettencourt speech was made as part of his duties as a police officer. Bettencourt spoke to MSP investigators concerning the conditions at the MPD, that is, the conditions of his employment. He also sent a letter to the Board and spoke with Chief Horn, and in both cases, such speech concerned the conditions of his employment. In speaking to the Board and Chief Horn, he was speaking "up the chain of command." It also can be said that his interview with the MSP was part of the chain of command as it was an official investigation involving official complaints about conditions at the MPD. He spoke on matters which he learned during the course of, or connection with, his employment. There is no citizen analogue to the speech.[10] On the other hand, he was not paid to speak, he did not speak "at" his place of employment (except when he spoke to Chief Horn), and he was not speaking on behalf of the MPD. While given the nature of the subject matter of Bettencourt's speech it is a close call, on this record, I find that while Bettencourt spoke on important matters

---

[10] Bettencourt filed a complaint with the MCAD, which arguably was done outside his duties as a police officer. However, such speech is more personal in nature rather than a matter of public concern, and therefore, would not support a cause of action.

of public concern, he did so in the course of performing his job as a police officer. Accordingly, Blanchette and Chief Horn are entitled to summary judgment on Plaintiff's state and civil rights claims for violation of his First Amendment rights. *Accord Thomas*, 277 F.Supp.3d 161 (while reporting on sexual harassment in department was matter of public concern, because plaintiff's speech was made pursuant to his ordinary responsibility as police officer utilizing appropriate chain of command, it was not protected).

### *Whether Plaintiff has stated a Claim for Violation of His Equal Protection Rights*

"In an equal protection case, the court considers (1) whether the [plaintiff] was treated differently than others similarly situated, and (2) whether such difference was based on an impermissible consideration, such as race. Some evidence of actual disparate treatment is a 'threshold requirement' of a valid equal protection claim … Plaintiffs claiming an equal protection violation must first identify and relate *specific instances* where persons *situated similarly in all relevant aspects* were treated differently, instances which have the capacity to demonstrate that plaintiffs were singled out for unlawful oppression." *Ayala-Sepulveda v. Municipality of San German*, 671 F.3d 24, 32 (1st Cir. 2012)(internal quotation marks, internal citations and citation to quoted case omitted). Blanchette argues that Bettencourt fails to state a claim because he cannot establish that Blanchette treated him differently from anyone else. Essentially, Blanchette argues he was an abusive jerk to everyone in the department.  I disagree. Bettencourt and other MPD employees testified that while Blanchette verbally and physically abused a number of MPD employees, he was far more abusive to Bettencourt, both in type and instances of abuse. Therefore, Blanchette's motion for summary judgment is denied.  Moreover, while the evidence of disparate treatment by Chief Horn is slim, it is sufficient to create a

genuine issue of material fact. Accordingly, Chief Horn's motion for summary judgment is denied as well.

<u>*Plaintiff's Conspiracy Claim*</u>

Bettencourt has alleged a state common law civil conspiracy claim against Blanchette and Chief Horn. "Massachusetts recognizes two types of civil conspiracy, so-called 'true conspiracy' and conspiracy based on section 876 of the Restatement (Second) of Torts." *Taylor v. Am. Chemistry Council*, 576 F.3d 16, 34–35 (1st Cir. 2009). "The first type, the 'true conspiracy,' has most frequently been applied to combinations of employers or employees working together in 'concerted refusals to deal.' Outside of this context, a claim of civil conspiracy is 'rare' and a 'very limited' cause of action. The plaintiff must allege and prove that by mere force of numbers acting in unison the defendants exercised some peculiar power of coercion of the plaintiff which any individual standing in a like relation to the plaintiff would not have had. Evidence of joint activity, even tortious activity, is insufficient to prove a coercive conspiracy." *Grant v. John Hancock Mut. Life Ins. Co.*, 183 F. Supp. 2d 344, 362–63 (D. Mass. 2002)(internal quotation marks, citations and citation to quoted cases omitted). "The second type of conspiracy, based on section 876 of the Restatement, is a form of vicarious liability for the tortious conduct of others. Because it is vicarious liability, this type of civil conspiracy requires an underlying tort. The conspiracy consists in agreeing to, or assisting in, this underlying tort. Massachusetts courts have recognized two theories of liability under section 876: (1) 'concert of action,' and (2) 'substantial assistance' or 'aiding and abetting.' " *Taylor*, 576 F.3d at 34-35 (citation to quoted case omitted). This type of conspiracy is not

> an independent action, but rather involves 'concerted action,' whereby liability is imposed on one individual for the tort of another. Under this theory, a defendant may be held liable for actions done by others pursuant to a common design or with the defendant's substantial assistance or encouragement. Key to this cause of

action is a defendant's substantial assistance, with the knowledge that such assistance is contributing to a common tortious plan. Thus, plaintiff must establish a common plan to commit a tortious act where the participants know of the plan and its purpose and take affirmative steps to encourage the achievement of the result.

*Grant*, 183 F. Supp. 2d at 363–64. A protracted discussion is not warranted. I find that as a matter of law, Bettencourt has failed to allege facts which would establish either theory of conspiracy under Massachusetts law. More specifically, he has failed to point to facts which would establish an agreement between Chief Horn and Blanchette, that either acted with a peculiar power of coercion, in unison or common design, or with the other's substantial assistance or encouragement. Summary judgment shall enter for Blanchette and Chief Horn on this claim.

### *Intentional Infliction of Emotional Distress*

Bettencourt has asserted a claim for intentional infliction of emotional distress against Chief Horn and Blanchette. Blanchette is not moving for summary judgment on this claim. Chief Horn seeks summary judgment on the grounds that this claim is barred by the applicable statute of limitations (three years). In the alternative, Chief Horn asserts that Bettencourt has failed to allege sufficient facts to establish a claim against him for intentional infliction of emotional distress.

To make out a claim of intentional infliction of emotional distress, the plaintiffs were required to show (1) that [defendant] intended, knew, or should have known that his conduct would cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct caused emotional distress; and (4) that the emotional distress was severe. The standard for making a claim of intentional infliction of emotional distress is very high. Liability cannot be predicated on mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities, nor even is it enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Conduct qualifies as extreme and outrageous only if it go[es] beyond all possible

bounds of decency, and [is] regarded as atrocious, and utterly intolerable in a
civilized community.

*Polay v. McMahon*, 468 Mass. 379, 385–86, 10 N.E.3d 1122, 1128 (2014).  Bettencourt has

alleged conduct by Chief Horn which falls within the statute of limitations, such as taking away

his motorcycle, taking away his firearm license and refusing to certify IOD status. However, I

find that, as a matter of law, he has failed to allege any conduct by Chief Horn which can be

deemed extreme and outrageous such that it would support a claim for intentional infliction of

emotional distress. Put another way, viewing the evidence in the light most favorable for

Bettencourt and drawing all reasonable inferences in his favor, a factfinder could not conclude

that Chief Horn's conduct meets the extreme and outrageous standard. Thus, summary judgment

shall enter for Chief Horn on this claim.

### *Plaintiff's Discrimination Claims*

Bettencourt has asserted claims for sex and gender discrimination under Chapter 151B

against the Defendants. The Defendants assert that Plaintiffs Chapter 151B claims are barred by

the applicable statute of limitations. In the alternative, they argue that the claims fail on their

merits.

### *Whether Plaintiff's Discrimination Claims are Time Barred*

Defendants assert that Bettencourt filed his complaint with the MCAD on November 3,

2014 and therefore, any incidents of discrimination which occurred more than three hundred

days prior, *i.e.*, before January 7, 2014, cannot be used to support his claim. Bettencourt argues

that he has alleged an ongoing pattern of discrimination by Blanchette that continued beyond

January 7, 2014 and therefore, under the continuing violation doctrine, his claims are not time-

barred.

Under Chapter 151B, a plaintiff must file an administrative complaint with the MCAD within 300 days of the date of the occurrence of the alleged unlawful employment practice. *See* Mass.Gen. L. ch. 151B, § 5. However, "where a plaintiff alleges a pattern of discriminatory conduct … the continuing violation doctrine applies. 'That doctrine permits a person to seek damages for alleged discrimination occurring outside the usual statute of limitations period if the alleged events are part of an ongoing pattern of discrimination, and there is a discrete violation within the statute of limitations period to anchor the earlier claims.'" *Diaz v. Jiten Hotel Mgmt., Inc.*, 671 F.3d 78, 85 (1st Cir. 2012)(internal citation omitted). "[T]o recover for discriminatory acts that occurred outside of the statute of limitations period, [a plaintiff must] demonstrate that: (1) at least one discriminatory act occurred no more than 300 days before [the date he filed his complaint with the MCAD]; (2) the alleged timely act or acts had a substantial relationship to the alleged untimely act or acts; and (3) any discriminatory acts that occurred outside of the statute of limitations period did not trigger [the plaintiff's] awareness and duty to assert [his] rights." *Id.* "The purpose of the continuing violation doctrine is to permit conduct to be actionable in certain circumstances where 'the improper conduct continues or evolves over a course of time' making it difficult for the plaintiff to determine their 'discriminatory nature and impact.'" *MacDonald v. Town of Upton*, 297 F. Supp. 3d 209, 212 (D. Mass. 2018)(citation to quoted case omitted). Massachusetts law differs slightly from federal law in determining whether a plaintiff's duty to assert his rights has been triggered. More specifically, Massachusetts has adopted a standard which the Supreme Judicial Court of Massachusetts has characterized as fairer to the employee as well as the employer in that it recognizes the difficult position of a plaintiff being subjected to harassment in the work place:  a "plaintiff who demonstrates a pattern of sexual harassment that creates a hostile work environment and that includes conduct within the … statute of limitations,

may claim the benefit of the continuing violation doctrine and seek damages for conduct that occurred outside the limitations period, unless the plaintiff knew or reasonably should have known that her work situation was pervasively hostile and unlikely to improve, and, thus, a reasonable person in [his] position would have filed a complaint with the MCAD before the statute ran on that conduct." *Cuddyer v. Stop & Shop Supermarket Co.*, 434 Mass. 521, 539, 750 N.E.2d 928, 941–42 (2001). "The proper focus" for determining when a cause of action accrues for limitations purposes is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful." *Shervin v. Partners Healthcare Sys., Inc.*, 804 F.3d 23, 33 (1st Cir. 2015)(internal quotation marks omitted).

As pointed out by Blanchette, the only possible incidents of alleged unlawful conduct by him after January 7, 2014 are the following: (1) one day prior to Blanchette returning to work on August 26, 2014, he was driving by the police station and stared at Bettencourt in an intimidating manner; (2) one day in the dispatch office, while staring at Bettencourt, Blanchette made comments about how he still runs the f'ing department and then he walked off; and (3) the next day, Blanchette looked right at Bettencourt and made a comment about how he was a patrolman and he could say whatever he wanted in the department-- as Blanchette was making this comment he took two or three steps towards Bettencourt and veered off towards the door. Bettencourt does not dispute that these are the only incidents involving Blanchette which occurred within the statute of limitations period. I have grave doubts as to whether these alleged incidents are sufficient to act as the necessary "anchor" during the statute of limitations period for the alleged pattern of abusive physical and, to a lesser extent, verbal conduct which occurred well before January 7, 2014 and are the mainstay of Bettencourt's discrimination complaint against Blanchette. The question is whether I can find that as a matter of law, a reasonable

person in Bettencourt's position would have known well before January 7, 2014 that his rights had allegedly been violated. Given the gravity and frequency of the abuse prior to 2014, I find that a reasonable person in Bettencourt's position would have known that his rights had been violated. Indeed, the incidents which happened before 2014 are the basis for Blanchette's independent claims for false imprisonment, assault and battery and intentional infliction of emotional distress. Blanchette's motion for summary judgment on this claim is granted, as I find it is time barred.

As to Chief Horn and the Town, Bettencourt does not dispute that he has not alleged any incidents of discrimination by Chief Horn or the Town which occurred during the statute of limitations period. Instead, he argues that the Court should analyze whether their claims are timely applying a systematic pattern of discrimination analysis. Federal courts analyzing the timeliness of discrimination claims brought under Title VII have recognized both the continuing violation theory and the "systematic violation" theory. "'[A] systemic violation need not involve an identifiable, discrete act of discrimination transpiring within the limitation period.... A systemic violation has its roots in a discriminatory policy or practice; so long as the policy or practice itself continues into the limitation period, a challenger may be deemed to have filed a timely complaint.'" *Morrison v. N. Essex Cmty. Coll.*, 56 Mass. App. Ct. 784, 793, 780 N.E.2d 132, 140 (2002). "A plaintiff claiming a systemic violation, bears the burden of demonstrating that 'a discernible discriminatory policy was in effect, and injured her, during the limitations period.'" *Kahriman v. Wal-Mart Stores, Inc.*, 115 F. Supp. 3d 153, 161 (D. Mass. 2015)(citation quoted case omitted). While the Massachusetts Supreme Judicial court has acknowledged that federal law recognizes the "systematic violation" theory, it has never expressly adopted it. While the issue is not free from doubt, I will assume that Massachusetts would recognize this theory.

Nonetheless, on this record, I find that Bettencourt's discrimination claims against the Town and Chief Horn are time barred. More specifically, he failed to carry his burden to demonstrate the requisite "proof of specific ongoing discriminatory policies or practices, or … specific and related instances of discrimination … permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice". *See Cornwell v. Robinson,* 23 F.3d 694, 704 (2ᵈ Cir. 1994). Chief Horn's and the Town's motion for summary judgment is granted on this claim.

*Plaintiff's Retaliation Claims*[11]

Plaintiff's retaliation claims are governed by the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817 (1973), which although originally adopted for use in Title VII cases, also applies when evaluating discrimination claims under Chapter 151B. *See Jones v. Walgreen Co.*, 679 F.3d 9, 20-21 (1ˢᵗ Cir. 2012). Bettencourt alleges that the Defendants retaliated against him for filing a complaint with the MCAD based on gender and sexual orientation discrimination. The alleged retaliatory actions include, moving his office from the main building at the MPD to a trailer, taking away the motorcycle which he was permitted to drive home, denying him a promotion, and initially denying him or not certifying him for IOD status.

To establish a prima facie case of retaliation under Chapter 151B, he must show: (1) he engaged in a protected activity; (2) he suffered a materially adverse action; and (3) there was a

---

[11] Defendants assert that Plaintiffs' retaliation claims under Chapter 151B are also time barred. However, substantially all of the retaliatory actions complained of by Bettencourt took place after he filed his MCAD complaint in November 2014, and therefore, are well within the statute of limitations. Moreover, because I found that Bettencourt's Chapter 151B discrimination claims are time barred, it was not necessary for me to address Defendants' argument that they are barred by Bettencourt's filing of a whistleblower claim under Chapter 149, §185(f). However, I do not find that Bettencourt's filing of a whistleblower claim under chapter 149 would bar his retaliation claims as they are not based on the same underlying cause of action, and therefore, would not result in duplicative damages.

causal connection between the protected activity and the adverse action. *See Dixon v. Int'l Bhd. Of Police Officers*, 504 F.3d 73, 81 (1st Cir. 2007); *Psy-Ed Corp. v. Klein*, 459 Mass. 697, 707, 947 N.E.2d 520, 530 (2011). The term "protected activity" refers to action taken by the plaintiff "to protest or oppose statutorily prohibited discrimination." *Fantini v. Salem State Coll.*, 557 F.3d 22, 32, (1st Cir. 2009). *See also Mole v. Univ. of Mass.*, 442 Mass. 582, 591 n.13, 814 N.E.2d 329 (2004). "Once the plaintiff makes out this prima facie case, the burden shifts to the defendant to articulate a legitimate, non-retaliatory explanation for its actions. If the defendant carries this burden of production, the burden shifts back to the plaintiff to show that the defendant's explanation is a pretext for unlawful retaliation.  To defeat summary judgment, the plaintiff need not prove retaliation by a preponderance of the evidence.. 'All a plaintiff has to do is raise a genuine issue of fact as to whether [retaliation] motivated the adverse employment action.' " *Planadeball v. Wyndham Vacation Resorts, Inc.*, 793 F.3d 169, 175 (1st Cir. 2015).  In this case, the Defendants have focused on whether Bettencourt had made out a prima facie case of retaliation. If they intended to articulate legitimate, non-retaliatory explanations for their actions, their arguments are not adequately developed.  Accordingly, the Court will limit is discussion as to whether Bettencourt has made out a prima facie case of retaliation—to the extent he has, his claims will go forward.

Under Massachusetts law, a plaintiff has engaged in protected activity if "he has opposed any practices forbidden under this chapter or because he has filed a complaint, testified or assisted in any proceeding under [the statute]." Mass.Gen.L. ch. 151B § 4(4).  "Adverse action" in the retaliation context is an act "that could well dissuade a reasonable worker from making or supporting a charge of discrimination." It is defined as: "any action 'to coerce, intimidate,

threaten, or interfere with' the plaintiff." *Dixon*, 504 F.3d at 81 (*citing* Mole, 442 Mass. 582, 591-92 n.14, 814 N.E.2d 329).

While the Defendants have not disputed that Bettencourt has satisfied the first prong of the *McDonnel Douglas* analysis, they assert that, as a matter of law, he has failed to establish that first, that he suffered an adverse action, and second, that any adverse action he did suffer was causally related to his protected activity. Bettencourt asserts that he suffered adverse employment actions when his office was transferred to the trailer, he was denied a promotion, his motorcycle was taken away, and when Chief Horn denied him IOD status. Bettencourt has not come forward with a scintilla of evidence that Blanchette had any role in any of these alleged adverse actions. For that reason, summary judgment shall enter for Blanchette on Bettencourt's retaliation claim. The remainder of this discussion with focus on whether Bettencourt has stated a retaliation claim against Chief Horn and/or the Town.

There is evidence in the record that Chief Horn and/or the Town did take the alleged actions against Bettencourt. The question thus becomes whether under the broad definition of "adverse action" recognized under Massachusetts law he suffered "effects on working terms, conditions, or privileges that are material, and thus governed by the statute, as opposed to those effects that are trivial and so not properly the subject of a discrimination action." *Sensing v. Outback Steakhouse of Fla., LLC*, 575 F.3d 145, 160 (1st Cir. 2009). The move of Bettencourt's office from the police department's main building to the trailer and the taking away of his motorcycle are both actions which arguably fall on the trivial end of the spectrum. Additionally, the time line is somewhat uncertain, it appears that these actions occurred prior to Bettencourt filing his MCAD complaint. Denial of a promotion and refusal to certify his IOD status, on the other hand, would have a material effect on working conditions. Defendants argue that even if

Bettencourt establishes that he suffered an adverse employment action, he cannot establish that the action was taken as the result of his having engaged in protected activity. The problem for the Defendants, however, is that they argue Bettencourt hasn't established that they denied his promotion because of his sexual orientation. However, for purposes of this claim, the question is whether he was denied the promotion *because he filed a complaint with the MCAD*. Given the temporal proximity of the filing of his MCAD complaint to the denial of his promotion, I find that Bettencourt has stated a *prima facie* case of retaliation against the Town and Chief Horn.[12] Moreover, while the evidence connecting Bettencourt's denial of his IOD status to his filing of the MCAD complaint is paper thin, I find that there is enough questions of fact to let the claim stand. Since Bettencourt has established a prima facie case of retaliation against the Town and Chief Horn, their motion for summary judgement is denied.

### *Plaintiff's False Imprisonment Claim*

Plaintiff has asserted a false imprisonment claim against Blanchette as a result of Blanchette ordering him into a cell sometime in 2011/2012. Blanchette argues that this claim is barred under the applicable statute of limitations (three years). Bettencourt asserts that this incident was part of the long term pattern of abuse by Blanchette and applying the continuing violation doctrine. "The continuing tort doctrine has been applied to a limited number of torts in Massachusetts," *see M.L. v. S.N.*, 85 Mass. App. Ct. 1107, 5 N.E.3d 2 (2014), and it is not clear that Massachusetts court would apply it to a false imprisonment claim. Even if the continuing tort/violation doctrine would apply to false imprisonment claims, however, I find this claim is time barred because Bettencourt cannot establish that it applies in this case.

---

[12] Chief Horn contends that he did not make the decision as to who got the position which Bettencourt applied for. I find that there is a dispute of fact on this issue.

## Conclusion

Defendant, Lieutenant Blanchette's Partial Motion For Summary Judgment (Docket No. 30) is ***granted***, in part and ***denied***, in part.

Defendant Town of Mendon, Mendon Police Department and Chief Ernest Horn's Motion For Summary Judgment (Docket No. 34) is ***granted***, in part and ***denied***, in part.

**SO ORDERED.**

**/s/ *Timothy S. Hillman*_____**
**TIMOTHY S. HILLMAN**
**UNITED STATES DISTRICT JUDGE**